## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA
for the use and benefit of
A MOUNTAIN CONSTRUCTION, INC.,

      Plaintiff,

v.                                                                    No. 2:23-cv-00106-MIS-GBW

CHP SOLUTIONS, LLC and
GREAT MIDWEST INSURANCE
COMPANY,

      Defendants.

## <u>ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

THIS MATTER is before the Court on Defendants CHP Solutions, LLC ("CHP") and

Great Midwestern Insurance Company ("Great Midwest")'s Motion for Partial Summary

Judgment Concerning the NMDOT Specification Not Being Wholly Incorporated and that There

Was No Wrongful Termination of the Subcontract ("Motion"), filed on March 15, 2024, ECF No.

36. Defendants filed an accompanying brief, ECF No. 37 to which Plaintiff responded, ECF No.

43, and Defendants replied, ECF No. 48. Upon due consideration of the Parties' submissions, the

record, and the relevant law the Court will GRANT Defendants' Motion.

## FACTUAL BACKGROUND

The Court repeats its recitation of the factual background from its previous order, ECF No.

54:

> This action concerns a contract between CHP and [A Mountain
> Construction, Inc. ("A Mountain")] for A Mountain to provide certain construction
> services at Fort Bayard National Cemetery in New Mexico. In March 2022, CHP
> entered into contract number 26C78622C0021 with the Department of Veteran
> Affairs for construction work at Fort Bayard National Cemetery. Compl. Under
> Miller Act, for Breach of Contract, & on Payment Bond ("Compl.") ¶ 6, ECF No.
> 1. Pursuant to 40 U.S.C. § 3131, Great Midwest executed a payment bond "for the

1

prompt payment of all persons supplying labor or materials used in the prosecution of the work." *Id.* ¶ 7. In connection with CHP's performance of contract 26C78622C0021, CHP entered into an Independent Contractor Agreement dated May 19, 2022 with A Mountain. Br. Supp. Mot. Partial Summ. J. ("Defs.' Br.") at 1 ¶ 1, ECF No. 37; Pl.'s Resp. Opp'n ("Pl.'s Br.") at 1, ECF No. 43. A true and correct copy of the Independent Contractor Agreement, hereafter referred to as the "Subcontract," is attached to Defendants' Brief as Exhibit 2, ECF No. 37-2. *See* Defs.' Br. at 1 ¶ 2; Pl.'s Br. at 1.

A Mountain performed construction work at Fort Bayard at least through October 2022. *See* Pl.'s Br. at 3 ¶ 5. The Subcontract provides that it was effective from the date of execution until October 31, 2022, and could "be extended by mutual written agreement of the Parties." Defs.' Br. at 3 ¶ 13; Pl.'s Br. at 1. On December 16, 2022, A Mountain made a demand for payment from Great Midwest under the bond for amounts allegedly owed under the contract. Compl. ¶ 13. A Mountain also made demand for payment on CHP. *Id.* ¶ 14.

Order for Joint Status Report at 1-2 (Oct. 7, 2024), ECF No. 54.

## PROCEDURAL BACKGROUND

As recounted in the Order for Joint Status Report,

A Mountain . . . asserts claims under the Miller Act, 40 U.S.C. § 3131, alleging violation thereof by CHP's and Great Midwest's failure to pay (Count I), Compl. ¶¶ 19-21; on the payment bond, alleging damages resulting from Great Midwest's alleged breach of the terms of the bond (Count II), *id.* ¶¶ 22-27; and for breach of contract, alleging that CHP breached the Subcontract by failing to pay amounts due and by wrongfully terminating the Subcontract (Count III), *id.* ¶¶ 28-32. Defendant Great Midwest filed its Answer on March 14, 2023, ECF No. 5. Defendant CHP filed its Answer on April 6, 2022, ECF No. 7. On the same day CHP also filed a counterclaim for breach of contract against A Mountain, ECF No. 8, which A Mountain answered on April 20, ECF No. 13.

*Id.* at 2-3. The present Motion was fully briefed on April 12, 2024. *Id.* at 3. The Court ordered additional briefing on the question of choice of law governing the contract (and by extension this dispute) in September 2024. *See* ECF Nos. 50, 51, 52, 53. The Subcontract contains a governing law clause specifying that Montana law would apply, which Defendants argued controls. Subcontract at 5, ECF No. 37-2; Joint Status Report Regarding Choice of Law at 2, ECF No. 51; Defs.' Resp. Mem. Br. Regarding Choice of Law, ECF No. 53. Plaintiff argued that New Mexico

law ought to apply pursuant to a state statute that renders unenforceable such choice-of-law clauses in construction contracts for improvements to property in New Mexico, N.M. Stat. Ann. § 57-28A-1 ("New Mexico Construction Choice-of-Law Statute"). Joint Status Report Regarding Choice of Law at 1, ECF No. 51; Pl.'s Mem. Br. Regarding Choice of Law at 3-4, ECF No. 52.

Thereafter, the Court issued an Order for Joint Status Report on October 7, 2024, ECF No. 54. In that Order, the Court noted that the New Mexico Supreme Court had not spoken definitively on the precise issue; namely, the effect of a choice-of-law provision in a non-U.C.C. contract. *Id.* at 8-9. Tasked with predicting that court's approach, therefore, this Court concluded that the New Mexico Supreme Court would likely apply a relevant choice-of-law-statute as a "step zero" "before turning to a Restatement (Second) [of Choice of Law] § 187 analysis." *Id.* at 12; *see also id.* at 15 ("[T]his Court concludes that under New Mexico's choice-of-law rules the court must first consider the applicability of the New Mexico Construction Choice-of-Law Statute before conducting an analysis guided by the Restatement (Second) § 187."). The Court further reasoned that the applicability of the New Mexico Construction Choice-of-Law statute in the instant case would be determined by the jurisdictional status of the land on which the construction was performed: "if jurisdiction over Fort Bayard National Cemetery is exclusively federal, then the New Mexico Construction Choice-of-Law Statute is inapposite." *Id.* at 15-16. The Parties had yet to adduce evidence demonstrating the jurisdictional status of the land at issue. Accordingly, the Court "determine[d] that an evidentiary hearing [wa]s necessary on the jurisdictional status of the land at Fort Bayard National Cemetery where the Subcontract was performed." *Id.* at 18. The Court advised the parties to "be prepared to present any documentary, expert, and/or other evidence they think bears on the issue of how and when the federal government acquired Fort Bayard National Cemetery and what if any jurisdictional reservations New Mexico made at that time." *Id.*

The Court held the evidentiary hearing on January 24, 2025. Clerk's Minutes (Jan. 24, 2025), ECF No. 62. In advance thereof, the Parties were ordered to

be prepared to argue and present evidence on the following . . . :

1. Where exactly on Fort Bayard National Cemetery the construction at issue in this case took place;

2. The jurisdictional status of the particular land on which the construction took place; and

3. If the land at issue is subject to varying jurisdiction over different subparts (for example, concurrent jurisdiction over X numbers of acres and exclusive federal jurisdiction over Y number of other acres), how New Mexico state law is to be applied in this case.

Notice of Hr'g (Oct. 31, 2024), ECF No. 58. At the hearing, Defendants' nineteen exhibits were admitted. *See* Witness & Ex. List (Jan. 10, 2025), ECF No. 60.[1] Defendants also put on three witnesses: Joshua Ashbaugh, Harry Palm, and Victor Vasqueuz.

Mr. Ashbaugh, a title searcher/examiner and licensed attorney, was admitted (without objection from Plaintiff) as an expert in title examinations and titles of real property in New Mexico. Using official land surveys and deeds, Mr. Ashbaugh testified about title to the land comprising Fort Bayard National Cemetery. He explained how legal descriptions by metes and bounds in certain deeds and statutes mapped onto the official Grant County land surveys of the area. Plaintiff's counsel briefly cross-examined Mr. Ashbaugh as to the ownership status of a small portion of the cemetery. Mr. Palm, a project manager for CHP, was for a time the site superintendent on the Fort Bayard project, and on-site thereafter. Mr. Palm also performed financial and invoicing functions. Mr. Palm testified on direct examination about the locations of work performed by A Mountain on various parts of the cemetery, and whether and how each piece

---

[1] Defendants disclosed eighteen exhibits in advance of the hearing. ECF No. 60. A nineteenth was designated and admitted without objection at the hearing.

of work is a part of the present legal dispute.[2] Finally, Defendants presented testimony from Mr. Vasqueuz, the director for all national cemeteries in New Mexico. Mr. Vasqueuz's duties include oversight for all repairs, construction, and other projects on the cemeteries. Mr. Vasqueuz testified about the extent of the federal government's administration of Fort Bayard National Cemetery: for example, paying for maintenance and utilities, and relying on Veterans Administration (VA) police for disturbances at the cemetery. Plaintiff did not cross-examine Mr. Vasqueuz and did not put on any witnesses of its own.

## DISCUSSION

The Court's Order proceeds in two parts. Before turning to the merits of the present Motion, the Court in Part I resolves the threshold question of choice-of-law which turns on the jurisdictional status of Fort Bayard National Cemetery. As set out fully below, the Court concludes that legislative jurisdiction over the relevant land at Fort Bayard National Cemetery is exclusively federal; the New Mexico Construction Choice-of-Law Statute does not apply thereon; and the dispute is governed by Montana law pursuant to the Subcontract. In Part II the Court then addresses the two issues raised in the present Motion, applying Montana law. The Court resolves that Defendants are owed summary judgment on both issues.

## I.    The Jurisdictional Status of Fort Bayard National Cemetery

### A.    *Legal Background on Jurisdiction Over Federal Land*

Across the United States, land owned by the federal government is subject to varying degrees of federal legislative jurisdiction.[3] "'Although some may assume' that federal installations

---

[2] Plaintiff began cross-examining Mr. Palm on issues relating to the substantive provisions of the Subcontract and claims in this case. Counsel for Defendants objected as to relevance, and Plaintiff's counsel conceded that the questioning was irrelevant to the purpose of the present hearing (jurisdictional status). The Court sustained the objection, and Plaintiff had no further cross-examination.

[3] "Jurisdiction" as discussed here embraces a legal issue distinct from the "jurisdiction" with which readers of federal court opinions are likely more familiar. Legislative jurisdiction, presently at issue, involves the authority of

[such as military bases and VA facilities] 'automatically come within Federal jurisdiction, that assumption is incorrect.'" *United States v. Davis*, 726 F.3d 357, 364 (2d Cir. 2013) (quoting *United States v. Williams*, 17 M.J. 207, 211 (Ct. Mil. App. 1984)). "Indeed, numerous courts across the country have concluded that mere evidence of a federal installation on federally owned land is insufficient to show federal jurisdiction." *United States v. Banks*, Nos. 20-50175, 20-50323, 2022 WL 3278942, at *3 (9th Cir. Aug. 11, 2022) (Koh, J., concurring). Legislative jurisdiction over federal land can be categorized into four types: (1) exclusive federal jurisdiction, in which only those state laws already existing at the time the state surrendered authority remain in effect on the land (such land is sometimes referred to as a "federal enclave")[4]; (2) partial jurisdiction, in which the federal government exercises exclusive authority but for within certain enumerated issue areas retained by the state (commonly, jurisdiction to serve process and/or impose taxes); (3) concurrent jurisdiction, in which the state and federal governments share legislative authority and state laws govern unless preempted by federal law pursuant to the Supremacy Clause, U.S. Const. art. IV, cl. 2; and (4) proprietorial jurisdiction, in which the federal government exercises no legislative power at all.[5] *See generally James Stewart & Co. v. Sadrakula*, 309 U.S. 94 (1940); *Collins v. Yosemite*

---

a government (state or federal) to make its laws applicable to persons or activities, whereas judicial (or adjudicative) jurisdiction involves the power of a government to resolve a particular dispute through its court system. *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 435 (4th Cir. 1999).

[4] *See Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1237 (10th Cir. 2012) ("The central principle of federal enclave doctrine is that Congress has exclusive legislative authority over these enclaves. But in the absence of applicable federal legislation displacing state law, those state laws that existed at the time that the enclave was ceded to the federal government remain in force."). The Court's above description of exclusive jurisdiction is, of necessity, an over-simplification. Congress, having the authority to legislate over land subject to exclusive federal jurisdiction, may provide for different rules by statute, and it has made applicable on enclaves state laws enacted after cession in several issue areas—most notably, state criminal law through the Assimilated Crimes Act. *Id.* (citing *United States v. Sharpnack*, 355 U.S. 286, 288, 290, 294-95 (1958)). "But no federal statute yet allows the broad application of state employment, tort, and contract law to federal enclaves. And 'it is well established that in order for Congress to subject a federal enclave to state jurisdiction, there must be a specific congressional deferral to state authority over federal property.'" *Id.* (quoting *W. River Elec. Ass'n v. Black Hills Power & Light Co.*, 918 F.2d 713, 719 (8th Cir. 1990)).

[5] Some courts have questioned whether the United States's jurisdiction is ever merely that of an ordinary proprietor given the mandates of the Property Clause, U.S. Const., art. IV, § 3, cl. 2. *See, e.g., United States v. Gabrion*,

*Park & Curry Co.*, 304 U.S. 518 (1938); *North Dakota v. United States*, 495 U.S. 423 (1990); *Paul v. United States*, 371 U.S. 245 (1963).

The federal government may acquire jurisdiction over land in several ways, and the evidence required to prove jurisdictional status depends somewhat on the method used in the particular transfer at issue. Initially, the only recognized method by which the federal government could obtain jurisdiction was by a state's consenting to federal purchase of land for the construction of "Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings" pursuant to the Enclave Clause, U.S. Const. art. I, § 8, cl. 17. But in 1885, "the Supreme Court held that in addition to consenting to purchases," a state "could 'cede' jurisdiction" over land to the federal government, and the federal government could also "'reserve' jurisdiction" over land when the state joined the Union. Roger W. Haines, *Federal Enclave Law* 3 (2011) (citing *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 531 (1885)). "The Court added that enclaves created by 'cession' or 'reservation' were not limited to [Enclave Clause] (needful building) purposes." *Id.* (citing *Fort Leavenworth*, 114 U.S. at 531). Thus, as the law currently stands, there are three methods by which the United States can obtain and exercise jurisdiction over land: consent, cession, and reservation. *Id.* at 17.

For jurisdiction obtained via consent, evidence must show (1) whether the United States owns the land,[6] (2) whether the state consented to the purchase of the land and the exercise of jurisdiction by the federal government, and, for land acquired after 1940,[7] (3) whether the federal

---

517 F.3d 839, 846-47 (6th Cir. 2008); *id.* at 859 (Moore, J., concurring). The Court need not wade into that debate here.

[6] States can also cede territorial jurisdiction to the United States over land that the United States does not own but leases from private individuals. Haines, *Federal Enclave Law* at 34-35.

[7] Prior to 1940 "federal acceptance of ceded jurisdiction was presumed absent an express refusal." *United States v. Fields*, 516 F.3d 923, 935 (10th Cir. 2008) (citing *Fort Leavenworth Ry. Co. v. Lowe*, 114 U.S. 525 (1885)). Congress did away with this presumption with the passage of 40 U.S.C. § 3112 in 1940, pursuant to which a duly authorized federal official must expressly accept ceded jurisdiction.

government accepted jurisdiction. *See, e.g.*, *Hall v. Coca-Cola Co.*, No. 2:18cv244, 2018 WL 4928976, at *7 (E.D. Va. Oct. 11, 2018). For land acquired through cession, evidence must show (1) whether the United States owns the land, (2) whether the state ceded legislative authority over the land, and (3) whether the federal government accepted the cession (with the same note about pre- versus post-1940 requirements, *see* n.7).

Importantly, secondary source evidence indicating simply *that* a state consented to acquisition and/or ceded authority and *that* the federal government accepted the cession as to certain land is insufficient to draw conclusions about the extent of the United States's jurisdiction over (i.e., the jurisdictional status of) that land. As discussed, jurisdiction obtained can be exclusive, concurrent, or partial, *see United States v. Fields*, 516 F.3d 923, 935 (10th Cir. 2008); *Pratt v. Kelly*, 585 F.2d 692, 696 (4th Cir. 1978), and the jurisdictional status of a particular piece of federal land is determined by the language of the original, primary source documentation by which the land was acquired. *See United States v. Unzeuta*, 281 U.S. 138, 142 (1930) ("The terms of the cession, to the extent they may lawfully be prescribed, determine the extent of the Federal jurisdiction."); *see also United States v. Gabrion*, 517 F.3d 839, 858 (6th Cir. 2008) (Moore, J., concurring) ("[T]o determine the extent of federal jurisdiction over a territory, we must look at the state statute authorizing the sale as well as the federal statute authorizing acquisition."). A piece of land may sometimes involve more than one method of federal acquisition—for example, jurisdiction may have been originally reserved at the time of statehood, then subsequently returned to the state, only to be later ceded back to the federal government again. Proving the jurisdictional status of that land would require primary source evidence from both the initial acquisition and the subsequent transfers. Moreover, tracts of land within the same nominal geographic location (e.g., within one national park or one military base) may be subject to differing jurisdiction depending

on when and how such tracts were obtained. Accordingly, jurisdictional status is an extremely fact-intensive determination.

Because consent is not at issue in the present case, *see infra* Section I.B., the remainder of this section will focus on the evidence necessary for cession and reservation. Regarding cession, courts most often rely on cession statutes, deeds of cession, and letters accepting jurisdiction as evidence establishing jurisdictional status. *See* Haines, *Federal Enclave Law* at 161 ("[T]he issues raised in determining the jurisdictional status of a given property include interpretation of statutes and the sufficiency of deeds, descriptions, recordings, and letters of acceptance or retrocession of jurisdiction under those statutes.").

*Cession Statues.* Many states have (or had at a relevant moment in the past) general cession statutes governing the jurisdiction over land obtained by the United States within that state's borders. *See, e.g.*, *Gabrion*, 517 F.3d at 848 ("In 1923, the State of Michigan formally consented to the cession of forest lands to the federal government, provided that the State would retain concurrent criminal jurisdiction over those lands. The parcel in question was deeded to the federal government on July 11, 1939, for reservation as national forest. Thus, there was acquisition and cession, and the extent of jurisdiction was described at the time of cession."); *United States v. Raffield*, 82 F.3d 611, 612 (4th Cir. 1996) (discussing North Carolina's cession statute). Of course, such statutes sometimes change, leading to different jurisdictional statuses over different pieces of land, as mentioned above.

Once a property is federally obtained, its jurisdictional status is not affected by later amendments to a state's general cession laws. Thus, to determine the jurisdictional status of a particular piece of land, "it is necessary to determine what statutes were in effect at the time the property was acquired or jurisdiction was accepted." Haines, *Federal Enclave Law* at 17. *See also,*

*e.g.*, *Abbay v. Aurora Pump Co.*, No. 62399-1-I, 2011 WL 3433131, at *18 (Wash. Ct. App. Aug. 8, 2011) (Dwyer, C.J., concurring) (noting that jurisdiction was exclusively federal over some portions of land obtained pursuant to a pre-1940 statute, but was concurrent over other portions obtained pursuant to a post-1940 statute). Cession statutes also often dictate the specific procedures that must be adhered to for jurisdiction to become effective; where those procedures have apparently not been followed, courts have found that a purported transfer of jurisdiction to the federal government was not effective. *See, e.g.*, *Atiqi v. Acclaim Tech. Servs., Inc.*, No. EDCV 14-00628-VAP, 2014 WL 12965984, at *8 (C.D. Cal. July 3, 2014) (holding that because the United States did not file a map of a military base as required by California cession statute, purported cession of exclusive jurisdiction over the base to the federal government was ineffective); *Graupner v. Lewis Ltd. Consultants, LLC*, No. ED CV 12-1388-JFW, 2012 WL 12895714, at *2-3 (C.D. Cal. Oct. 26, 2012) (same); *United States v. Davenport*, 340 F. Supp. 3d 1105, 1110-11 (D.N.M. 2018) (holding that United States did not prove that the federal government had properly complied with the New Mexico cession statute to effectuate jurisdictional transfer).

*Deeds of cession.* Deeds of cession are also frequently used as evidence of jurisdictional status. *See, e.g.*, *Pratt*, 585 F.2d at 696-97; *Lord v. Local Union No. 2088, Int'l Bhd of Elec. Workers*, 646 F.2d 1057, 1060 (5th Cir. 1981); *see also Bachman v. Fred Meyer Stores, Inc.*, 402 F. Supp. 2d 1342, 1348 (D. Utah 2005) (finding that draft deed and letters to and from the federal government were sufficient to establish jurisdictional status). *But see Cabrales v. BAE Sys. San Diego Ship Repair, Inc.*, No. 21-cv-02122-AJB-DDL, 2023 WL 8458247, at *4 (S.D. Cal. Dec. 6, 2023) (finding that grant deed was not required to establish jurisdictional status).

*Letters of acceptance.* As discussed above, for land acquired after 1940, the federal government must formally accept ceded jurisdiction. 40 U.S.C. § 3112(b); *see also, e.g.*, *Wood v.*

*Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *8 (E.D. La. May 16, 2011) (finding that the defendants had not proven federal jurisdiction over a particular federal facility where they had not adduced evidence of acceptance). The United States most often does so through a letter of acceptance transmitted from a federal official to the state governor. *See, e.g.*, *Puerto Rico v. Koedel*, 927 F.2d 662, 664-65 (1st Cir. 1991); *United States v. Jones*, 480 F.2d 1135, 1137 (2d Cir. 1973); *Vincent v. Gen. Dynamics Corp.*, 427 F. Supp. 786, 790, 795-96 (N.D. Tex. 1977). Such letters may refer to a specific cession as to a specific piece of land, or may more generally accept any cessions over any land in the state previously acquired by the federal government. *Compare, e.g.*, *Atl. Marine Corps Cmtys., LLC v. Onslow County*, 497 F. Supp. 2d 743, 747 (E.D.N.C. 2007) (discussing letters of acceptance pertaining to "certain lands in Onslow [or Craven] County" (alteration in original)), *with, e.g.*, *Watkins v. Safety-Kleen Sys., Inc.*, No. 5:08-cv-224-KSF, 2008 WL 4073554, at *5 (E.D. Ky. Aug. 29, 2008) (holding that letter of acceptance indicating acceptance of jurisdiction over "*all* lands acquired for military purposes" in Kentucky was effective as to a military installation previously acquired, even though such installation was not specifically named).

By way of illustration: In a typical, simple case, a general cession statute might provide that the state cedes exclusive jurisdiction over any land within its borders that the United States acquires; a deed of cession indicates that a particular piece of land was acquired by the United States while such statute was in effect and does not provide for any reservation of jurisdiction specific to the deeded land; and, for transfers after 1940, a letter from an appropriate federal authority establishes that the United States accepted jurisdiction over that land.

Evidence establishing jurisdiction can be somewhat different in the case of land originally obtained by the United States prior to a state's admission to statehood. In such instances, the state's

11

admission act and/or enabling act (governing its admission to the Union) is often crucial to establish whether a relevant reservation of jurisdiction was made a condition of the state's admission. In *Olsen v. McPartlin*, for example, a federal district court observed that Fort Snelling was established before Minnesota became a state and that when Minnesota was admitted to the Union its Organic Act and Enabling Act did not reserve jurisdiction over that area. 105 F. Supp. 561, 562 (D. Minn. 1952). "As a result," the court reasoned, "Fort Snelling was included within the limits of the State of Minnesota, and it became a part of the State when Minnesota was admitted to the Union. The United States then possessed in [Fort Snelling] only the rights of an ordinary proprietor." *Id.* (internal citation omitted). However, the state later ceded exclusive jurisdiction over the Fort by a specific cession statute (in 1889, before the federal government's explicit acceptance was required). *Id.* at 562-63.

Similar reasoning has been employed by courts as to land in Hawaii, Arizona, California, and Oklahoma. *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1001-02 (9th Cir. 2021) (holding that marine corps base was subject to concurrent jurisdiction: Under Hawaii's Admission Act, the United States reserved jurisdiction over military areas, but permitted Hawaii to exercise concurrent jurisdiction subject to certain conditions, unless the federal government revoked such concurrent jurisdiction by delineating a military area as critical; the base at issue had not been so designated); *State v. Galvan-Cardenas*, 799 P.2d 19, 22 (Ariz. Ct. App. 1990) ("The boundary commission land was reserved to the United States in 1907. [citing federal executive proclamation.] When Arizona was admitted to the Union, the United States did not retain exclusive jurisdiction over the boundary commission land. [citing Admission Act.] Accordingly, Arizona and the United States have concurrent jurisdiction over this strip of land."); *Graupner*, 2012 WL 12895714, at *2 ("[W]hen the United States admitted California into the Union, it did not reserve exclusive jurisdiction over

the federal lands within the state, and therefore retained only the rights of an ordinary proprietor. [citing Admission Act.] The parties agree that, at least until 1940, the United States did not have exclusive jurisdiction over Fort Irwin."); *State v. Cline*, 322 P.2d 208, 213 (Okla. Crim. App. 1958) ("It clearly appears there was no express reservation or acquisition by the Federal Government or cession of jurisdiction by Oklahoma of this area. Hence, the Federal Government is not clothed with exclusive jurisdiction in the Wichita Mountains Wildlife Refuge.").

In sum, jurisdictional status over federal land is usually a very complex and fact-intensive inquiry. Most often it can be conclusively established only via primary source documentation indicating what parcel of land was obtained by who and when, and what laws governed the jurisdiction over such land at the relevant time(s) of transfer(s). The jurisdictional status of land at Fort Bayard National Cemetery appears to be an issue of first impression in any court.

B.    *Jurisdictional Status of Fort Bayard National Cemetery*[8]

Fort Bayard was originally established as a military reservation by executive order on April 19, 1869. *See also* Headquarters Dep't of the Mo., Gen. Order No. 19 (May 25, 1869). According to a document prepared pursuant to federal statute by the Government Publishing Office that enumerated "the authority for, and the boundaries of, the existing military reservations" in 1880, Fort Bayard was "[d]eclared by Executive order dated April 19, 1869[,]" was "[s]ituated in township 17 S., ranges 12 and 13 W., and [wa]s not connected with the public surveys[,]" and comprised 8,840 acres.[9] In 1899, an army hospital was established at Fort Bayard. D.M. Appel,

_____

[8] This Section utilizes both evidence submitted by the Parties as well as federal government documents. The Court may take judicial notice of government documents under Fed. R. Evid. 201(b)(2). *Standing Akimbo, LLC v. United States*, 955 F.3d 1146, 1152 n.2 (10th Cir. 2020); *accord Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005).

[9] United States, Laws of the United States of a Local or Temporary Character, and Exhibiting the Entire Legislation of Congress upon Which the Public Land Titles in Each State and Territory Have Depended. December 1, 1880 at 1180 (1884).

*United States General Hospital for Tuberculosis at Fort Bayard, N.M.*, XXXV JAMA 1003 (1900). Twenty-eight acres were removed from the military reservation by Executive Order 341-A dated July 15, 1905. The reservation was further modified by Executive Order 477, dated July 14, 1906. This executive order sets forth the metes and bounds then comprising the reservation. The War Department acquired 4,493 additional acres of land "to the north and northeast of the reservation" for the purpose of protecting Fort Bayard's water supply by six executive orders between 1907 and 1911, as well as several warranty and quitclaim deeds from private individuals. Off. Judge Advoc. Gen., United States Military Reservations, National Cemeteries, and Military Parks: Title, Jurisdiction, Etc. at 250-52 (1916); *see also* Exec. Order No. 637 (May 23, 1907); Exec. Order No. 919 (July 23, 1908); Exec. Order No. 970 (Nov. 13 1908); Exec. Order No. 1213 (June 22, 1910); Exec. Order No. 1257 (Oct. 22, 1910); Exec. Order No. 1341 (Apr. 24, 1911).

Around the same time, the United States made several land grants to the Territory of New Mexico. Nat'l Archives & Records Admin., Records of the Bureau of Land Management, Record Group 49, Letters Received by the Surveyors General of New Mexico 1854-1907 (1988). New Mexico was admitted as a state in 1912. *New Mexico v. Texas*, 275 U.S. 279, 293 (1927). New Mexico's Enabling Act, enacted in 1910, made additional land grants. Enabling Act § 6; 36 Stat. 557 (1910). The Enabling Act officially transferred to the State the land that had been granted to the Territory: "[I]t is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State . . . ." Enabling Act § 10; 36 Stat. 563. The Enabling Act makes no express reservations of jurisdiction except as to Indian land. Enabling Act § 2; 36 Stat. 557. The terms of the Enabling Act were incorporated into New Mexico's state Constitution. *See* N.M. Const. art. 21, § 9 ("This state and its people consent to all and singular the provisions of the said act of

congress, approved June twentieth, nineteen hundred and ten, concerning the lands by said act granted or confirmed to this state, the terms and conditions upon which said grants and confirmations were made and the means and manner of enforcing such terms and conditions, all in every respect and particular as in said act provided.").

Control of the Fort Bayard army hospital was transferred within the federal government from the Public Health Service to the Veterans' Bureau in 1922, Exec. Order. No. 3699. In 1945, New Mexico ceded by statute exclusive jurisdiction to the United States "over all those lands now comprising the reservation of the Veterans' Administration Facility at Fort Bayard, New Mexico," described by metes and bounds. 1945 Laws of N.M. ch. 23, N.M. Stat. Ann. § 19-2-9. The statute reserved jurisdiction to New Mexico only to serve process and stated that "the jurisdiction herein ceded shall continue no longer than the United States shall own and hold said lands." *Id.*

The Court must now briefly digress from the main plot of the jurisdictional story to discuss whether the United States accepted the jurisdiction ceded by this New Mexico statute in 1945. At the hearing on January 25, no Party adduced conclusive evidence of the United States's acceptance of the jurisdiction ceded pursuant to Section 19-2-9. The Court therefore ordered the Parties "to file a Joint Status Report within thirty (30) days advising the Court on their efforts to obtain the formal letter (or other official document) from the United States accepting" that jurisdiction. ECF No. 63. The Parties requested an extension, which the Court granted. ECF Nos. 64, 65. On March 26, 2025, Defendants filed a Status Report to which they attached a document that they propose is the letter of acceptance the Court requested. ECF No. 67 [hereinafter Status Report]. The letter is internally dated May 24, 1945, and indicates that it was received by the War Department Secretary's Office on June 18, 1945 and returned to the Office of the Governor of New Mexico on June 30, 1945. *See* Ex. 1, ECF No. 67-1 [hereinafter Letter of Acceptance]. The Letter of

Acceptance states: "[N]otice is hereby given that the United States accepts exclusive jurisdiction over all lands acquired by it for military purposes within the State of New Mexico, title to which has heretofore vested in the United States, and over which exclusive jurisdiction has not heretofore been obtained." *Id.* It is signed by the United States Secretary of War and counter-signed by the Governor of New Mexico. *Id.* Title to the lands at issue in Section 19-2-9 vested in the United States many years prior, via the series of executive orders described above. And, as Defendants note, Section 19-2-9 was enacted shortly before the Letter of Acceptance was dated, on April 3, 1945. *See* Status Report at 1. Thus, the Letter of Acceptance apparently effectuates the cession of jurisdiction in Section 19-2-9.

There is, however, one potential sticking point: the Letter of Acceptance's limitation to "lands acquired by [the United States] *for military purposes*." ECF No. 67-1 (emphasis added). Defendants argue that "the Fort Bayard land was acquired for military purposes and continues to be used for military purposes because the portion at issue is used as a cemetery where veterans for the United States Military are buried." Status Report at 2. Although the Court ultimately concludes the Letter of Acceptance does apply to Section 19-2-9 because the relevant lands were in fact *originally acquired* for military purposes, the Court notes as a matter of thoroughness that the State of New Mexico has previously indicated a more narrow understanding of the meaning of "military purposes." In 1913, New Mexico enacted a specific cession statute ceding jurisdiction over Fort Bayard to the United States. That statute stated:

> That exclusive jurisdiction be, and the same is hereby ceded to the United States over all the territory now owned by the United States and comprised within the limits of the military reservation of Fort Bayard, in Grant County, as declared from time to time by the President of the United States, and over such lands as have been or may hereafter be acquired for the enlargement of said reservation; Provided, however, that the State of New Mexico reserves the right to serve civil or criminal process within said reservation in suits or prosecutions for or on account of rights acquired, obligations incurred, or crime committed in said State, but outside of such

16

cession and reservation; And provided further; that the jurisdiction herein ceded shall continue no longer than the United States shall own and hold such reservation for military purposes.

1913 Laws of N.M. ch. 35 (codified at N.M. Stat. Ann. § 5565 (1915)). But just several years later, in 1921, New Mexico enacted a "re-cession" statute that recalled and withdrew the "exclusive jurisdiction ceded to the United States over all the territory occupied by the Fort Bayard Military Reservation in Grant County, New Mexico." 1921 Laws of N.M. ch. 54. The re-cession statute catalogues the United States's then-current use of the Fort Bayard land as a hospital for "discharged sick and disabled soldiers, sailors, and marines" and concludes therefrom that "Fort Bayard Military Reservation is no longer owned and held for military purposes." *Id.* The statute therefore re-established the jurisdiction of the state over the land "until such period as the Military Reservation shall again be used by the United States exclusively for military purposes." *Id.* Of course, neither the 1913 nor 1921 laws are still controlling, given the later 1945 cession statute (Section 19-2-9). Nonetheless, these statutes demonstrate that New Mexico apparently had a fairly narrow understanding of what constituted "military purposes," one that did not include operation of a veterans' hospital—the purpose for which the land was being used when it was transferred in 1945.

This legislative history would give the Court greater pause if the Letter of Acceptance stated that the United States accepted exclusive jurisdiction over lands "*used* by it for military purposes," or some such similar language. But, in fact, the Letter of Acceptance accepts jurisdiction over lands "*acquired* by [the United States] for military purposes." ECF No. 67-1. As discussed above, the land at issue was first acquired by the United States via a series of executive orders establishing and expanding Fort Bayard Military Reservation. Accordingly, the Court finds that the land was acquired for military purposes (whether or not it has been used that way in

perpetuity) and therefore falls within the plain language of the Letter of Acceptance. The Court concludes that the United States accepted the exclusive jurisdiction ceded pursuant to Section 19-2-9 by the Letter of Acceptance, ECF No. 67-1.

At the January 25, 2024 hearing, Mr. Ashbaugh testified that the current Fort Bayard National Cemetery (as located on official survey) is within the legal description contained in Section 19-2-9. The survey is reproduced below. Defs.' Ex. 8, ECF No. 60 at 127-28.



As depicted, the Fort Bayard National Cemetery as it currently exists consists of two rectangles. Witnesses and counsel at the hearing referred to the "larger rectangle" and the "smaller rectangle"

as indicated by the Court on the survey.[10] For ease of reference, the Court will use the same

terminology.

In 1963 New Mexico enacted a new general cession statute providing for concurrent

jurisdiction as the default. That statute, which is still currently in effect, states in relevant part:

> Section 2. TAXATION – CIVIL PROCESS – CONCURRENT
> JURISDICTION. In no event shall any transfer of legislative jurisdiction between
> the United States and this state take effect . . . unless:
>     A. this state shall have jurisdiction to tax . . . ;
>     B. any civil or criminal process lawfully issued by competent authority of
> this state or any of its subdivisions, may be served and executed within such land
> or other area to the same extent and with the same effect as such process may be
> served and executed generally within this state . . . ; and,
>     C. this state shall exercise over such land or other area the same legislative
> jurisdiction which it exercises over land or other areas generally within this state,
> except that the United States shall not be required to forego such measure of
> exclusive legislative jurisdiction as may be vested in or retained by it over such
> land or other area pursuant to this act . . . .

1963 Laws of N.M. ch. 262 (N.M. Stat. Ann. § 19-2-2).

The land comprising the VA hospital facility (about 468 acres) was conveyed to the State

of New Mexico by warranty deed on June 15, 1966 for the operation of a state hospital. Defs.' Ex.

6, ECF No. 60 at 111-24. This conveyance specifically excluded "that part known as the Fort

Bayard Veterans Administration Cemetery," described by metes and bounds. *Id.* at 115-16. At the

January 25 hearing, Mr. Ashbaugh testified that the legal description of this exclusion includes the

larger rectangle of the cemetery, but not the smaller rectangle. In 1974, about 14.8 acres "once

being a portion of the VA Hospital reservation, Fort Bayard" were transferred within the federal

government from the Department of Medicine & Surgery to the National Cemetery System, with

a description of metes and bounds and accompanying map. Letter from Donovan E. Hower, Dir.,

---

[10] For the benefit of the reader, the Court has added the blue and red outlines and the blue "Larger Rectangle"
and red "Smaller Rectangle" text on the above survey.

Land Mgmt. Serv., Veterans Admin., to Paul N. Schmoll, Hosp. Dir., Veterans Admin. Hosp. (Nov. 25, 1974).

To summarize, exclusive jurisdiction over both the larger rectangle and the smaller rectangle was ceded by specific cession statute from New Mexico to the United States in 1945. The United States accepted that exclusive jurisdiction shortly thereafter. Letter of Acceptance, ECF No. 67-1. In 1966, much of the surrounding land was conveyed by the United States to New Mexico, with the explicit exception of the larger rectangle: the United States retained ownership of that land, and, therefore, the prior grant of exclusive jurisdiction by New Mexico likewise endured.

The smaller rectangle, however, presents a different situation. As Mr. Ashbaugh testified, the smaller rectangle was within that land conveyed from the United States to New Mexico in 1966 (and not excepted). Therefore, at that time, jurisdiction over the smaller rectangle was returned to New Mexico. *See* N.M. Stat. Ann. § 19-2-9 (stating that exclusive jurisdiction would continue only so long as the United States retained ownership). In 1991, New Mexico conveyed via quitclaim deed about four acres to the United States "for the expansion of the Ft. Bayard National Cemetery." Letter from Edward J. Derwinski, U.S. Sec'y of Veterans Affairs, to Charles G. Thomas, Sec'y, State of New Mexico (June 22, 1990); *see* Defs.' Ex. 7, ECF No. 60 at 125-26. The quitclaim deed makes no mention of jurisdiction. All indications are that this quitclaim deed was *intended* to convey to the United States the four acres contained in the smaller rectangle, and both state and federal governments have apparently been behaving as though it in fact did so. Defendants' witness Victor Vasqueuz testified extensively about the U.S. Veterans Administration's operational control of the full Fort Bayard National Cemetery, both larger and smaller rectangles.

However, Mr. Ashbaugh testified that the legal description contained in the quitclaim deed does *not* align with the legal description of the smaller rectangle. By the plain terms of the relevant deeds and statutes, and based on the evidence before the Court, the smaller rectangle is apparently still owned by the state of New Mexico (having been transferred as part of the 1966 warranty deed) and is subject to New Mexico's jurisdiction. Even if the quitclaim deed conveyed the correct four acres, however, the smaller rectangle would still be subject to concurrent jurisdiction. Exclusive federal jurisdiction over that land terminated by the terms of Section 19-2-9 when it was transferred to New Mexico in 1966. At the time of the 1991 quitclaim deed, New Mexico's general cession statute providing for concurrent jurisdiction governed. In the absence of some other evidence of cession of exclusive jurisdiction and acceptance thereof by the United States, it is therefore presumed that the four acres of the quitclaim deed are subject to concurrent jurisdiction.[11] Thus, New Mexico retains legislative jurisdiction over the smaller rectangle.

C.     *Jurisdictional Status and Choice of Law*

The Court hereby incorporates by reference the entirety of the choice-of-law analysis in its prior Order for Joint Status Report, ECF No. 54 at 3-16. For thoroughness, the analysis as it bears on the import of Fort Bayard's National Cemetery jurisdictional status is briefly summarized here. As discussed in the Order for Joint Status Report, the jurisdictional status of the cemetery determines whether the New Mexico Construction Choice-of-Law Statute applies. This is so because where federal land is subject to exclusive federal jurisdiction, only those state laws *already existing* at the time the state surrendered sovereignty will remain in effect. *Sadrakula*, 309 U.S. at

---

[11] The Court emphasizes again that New Mexico apparently still owns the land in the smaller rectangle and therefore exercises sole legislative jurisdiction thereupon. However, for the sake of completeness and in the event this issue recurs in the future, the Court additionally notes that *even if* the quitclaim deed did effectively convey the four acres contained in the smaller rectangle, the Parties have not adduced evidence demonstrating compliance with the requirements of New Mexico's cession statute, N.M. Stat. Ann. § 19-2-2. Such evidence would be required to establish that the state and federal governments exercise concurrent jurisdiction. *Cf. Davenport*, 340 F. Supp. 3d at 1110-11.

99-100 ("[O]nly the [state] law in effect at the time of the transfer of jurisdiction remains in force, future statutes of the state are not a part of the body of laws in the ceded area."). Where federal land is subject to concurrent jurisdiction, state laws govern unless preempted by federal law. *North Dakota*, 495 U.S. at 434.

Here, New Mexico ceded exclusive jurisdiction over the larger rectangle of the cemetery (and the United States accepted) in 1945, and the New Mexico Construction Choice-of-Law Statute was enacted in 2011, N.M. Stat. Ann. § 57-28A-1. Thus, the Statute does not apply on the larger rectangle. Moving, then, to an analysis under the Restatement (Second) of Conflict of Laws § 187, pursuant to Section 187(1) the Court will give effect to the Parties' contracted-for choice-of-law and apply Montana law (per the governing law clause of the subcontract) to claims and issues arising out of events located on the larger rectangle. Because the smaller rectangle, by contrast, is subject to either exclusive New Mexico jurisdiction or concurrent state and federal jurisdiction, the New Mexico Construction Choice-of-Law Statute *does* apply. Pursuant to that statute, the governing law clause is unenforceable, and the Court will apply New Mexico law to claims and issues arising out of events on the smaller rectangle.

   D.    *Location of the Construction Work Forming the Basis of This Controversy*

Defendants' witness Mr. Harry Palm testified as to the locations of construction on the cemetery using a map color-coded by "phases" of work. Defs.' Ex. 1 at 6; ECF No. 70. That map is reproduced for reference below.



According to Mr. Palm, A Mountain's claims for payment (giving rise to its Complaint)

are associated with work conducted as part of Phases 2 (yellow color), 3 (green color), and 5 (red

color), all of which are contained entirely within the larger rectangle. Mr. Palm also testified that

Plaintiff "dump[ed]" some spoils at the end of the cemetery.[12] Based on Mr. Palm's testimony,

which was uncontroverted by Plaintiff, it appears that the only part of the present dispute that

concerns the smaller rectangle is the "spoils" allegedly left behind by A Mountain. Otherwise, the

work associated with the smaller rectangle was Phases 1 and 4—Mr. Palm testified that there was

no enduring problem with A Mountain's completion of Phase 1 work and that no work was ever

---

[12] At the Court's request, Defendants filed a version of the color-coded map exhibit with an "X" marking the location of the dumped spoils. ECF No. 70. That version, with the "X," is above.

done on Phase 4, and so neither are part of the present controversy. Based on Mr. Palm's undisputed testimony, the vast majority of the issues in this case are associated with construction work performed on the larger rectangle, which, as established above, is subject to exclusive federal jurisdiction. Thus, in accordance with the Court's choice-of-law analysis, *see supra* I.C.; Order for Joint Status Report at 15-16, the Court will apply Montana law pursuant to the Subcontract's governing law clause.[13]

## II.    Motion for Partial Summary Judgment

Having resolved the choice-of-law question, the Court now turns to the substance of the Motion. Defendants seek summary judgment on two issues: (1) that the New Mexico Department of Transportation Standard Specifications for Highway and Bridge Construction [hereinafter NMDOT Spec.] "only applies as specifically referenced in the project specifications and was not incorporated in whole[,]" Defs.' Br. at 8; and (2) "that there was no wrongful termination of the Subcontract by CHP based on the Subcontract language setting a term and the failure of the parties to extend the term[,]" *id.* The Court will first describe the relevant legal standard and recount the undisputed material facts, then will address each issue in turn.

### A.    *Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking

---

[13] If and when the dumping-of-spoils issue comes before this Court for decision (presumably as part of CHP's counterclaim for breach of contract for A Mountain's "[f]ailing to complete its work in a workmanlike manner," Counter Claim CHP Solutions, LLC at 2, ECF No. 8), then the Court will apply New Mexico law given that those events took place on the smaller rectangle.

summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once that threshold is met, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In applying the summary judgment standard, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) (citation omitted).

B.    *Undisputed Material Facts*[14]

CHP and A Mountain entered into the Subcontract on May 19, 2022, "[i]n connection with CHP's performance of contract number 26C78622C0021." Defs.' Br. at 1 ¶ 1; Pl.'s Br. at 1. The bid documents include specifications for the project [hereinafter Project Specifications].[15] Defs.' Br. at 2 ¶ 5. Section 32 12 16 of the Project Specifications identifies applicable publications in (1.2), which list includes the NMDOT Spec. at subsection 1.2(F). Defs.' Br. at 2 ¶ 9; Pl.'s Br. at 1. Section 32 12 16 (1.2) of the Project Specifications states: "Comply with references to extent specified in this section." Defs.' Br. at 3 ¶ 10; Pl.'s Br. at 1.[16]

The Subcontract also states: "The term of this Agreement (the Term) will begin on the date of this Agreement and will remain in full force and effect until October 31, 2022, subject to earlier termination as provided in this Agreement. The Term of this Agreement may be extended by mutual written agreement of the Parties." Subcontract at 1-2; Defs.' Br. at 3 ¶ 13; Pl.'s Br. at 1.

---

[14] The Court has chosen to include only proffered facts that are material to the present motion. To the extent a fact has been omitted, the Court hereby deems such fact immaterial to the present motion.

[15] The Parties dispute the extent to which the Project Specifications are incorporated in the Subcontract—that issue is discussed fully below.

[16] For clarity's sake, the Court notes that it has presently before it two "Sections" of the Project Specifications: "Section 01 00 02: General Requirements (Minor NCA Projects)," attached as Exhibit 3 to Defendants' Reply (ECF No. 48-3), and "Section 32 12 16: Asphalt Paving," attached as Exhibit 3 to Defendants' Motion (ECF No. 37-3).

The Parties never executed a written agreement extending the term of the Subcontract. Defs.' Br. at 3 ¶ 14.[17] On November 22, 2022, CHP notified A Mountain (via email) "that it was not extending the period of performance beyond the term in the Subcontract." Defs.' Br. at 3 ¶ 15; Pl.'s Br. at 1.

### C.    *Incorporation of NMDOT Spec.*

#### 1.    Parties' Arguments

Defendants argue that the NMDOT Spec. is only incorporated to the extent delineated in the Subcontract. Specifically, Defendants argue that the incorporation of the NMDOT Spec. is limited to the references specified in the Project Specifications, Section 32 12 16 (1.2). Defendants note that (1.2) states, "the references included in 1.2 are to be complied with 'to the extent specified in this section[,]" Defs.' Br. at 4, and that the use of "section" in that phrase is a "clear . . . reference to Section 32 12 16 because in bold at the top of the top page it refers to this portion of the contract documents as 'Section 32 12 16 Asphalt Paving.'" *Id.* Because the referenced documents including the NMDOT Spec. are incorporated only to the extent specified, they are not "incorporated in their entirety." *Id.* at 4-5. Defendants further argue that the limited incorporation of the NMDOT Spec. is evidenced in the six paragraphs of Project Specifications Section 32 12 16 that expressly and explicitly identify the NMDOT Spec. *Id.* at 5. Defendants also refute an anticipated argument from A Mountain that one provision (2.1(C)) in the Project Specifications Section 32 12 16 "shows that the NMDOT Spec. controls the entire subcontract." *Id.* at 5. That provision states that "in conflicts between this specification and the requirements in [NMDOT Spec.], the [NMDOT Spec.] takes

---

[17] Although A Mountain disputes this fact, Pl.'s Br. at 2, their proffered evidence in fact supports it. A Mountain cites to their attached affidavit from Bridget Spedalieri, ECF No. 43-1. Ms. Spedalieri's affidavit states: "Work on the project had been delayed by changes to the project and we [A Mountain] had had negotiations with CHP Solutions over the additional time to be added to the project, **although CHP Solutions never issued changes to us.**" ECF No. 43-1 ¶ 12 (emphasis added).

precedence." *Id.* Defendants argue that context shows that that provision only modifies a specific part of the Project Specifications, not the entire contract. *Id.*

A Mountain responds, first, that the Subcontract "contains no incorporation by reference of the Specifications, the A Mountain proposal or the prime contract." Pl.'s Br. at 3. A Mountain next argues that, even if the Project Specifications are incorporated, the contract is ambiguous as to the degree to which they control. *Id.* at 3-4. As evidence of the contract's ambiguity, A Mountain points to the Parties' interpretation thereof during performance: at times the Parties "rel[ied] on incorporations of the NMDOT Spec in other portions of the [Project Specifications] as controlling over a separate subparagraph where NMDOT Spec was not referenced." *Id.* at 4. Finally, A Mountain relies on the clause that Defendants predicted it would in their opening brief. Provision 2.1(c), A Mountain argues, governs the entirety of the Project Specifications with regard to the NMDOT Spec. *Id.* A Mountain offers the following interpretation of the language used to describe subdivisions in the Project Specifications:

> A review of Section 01 00 02 General Requirements makes clear that in drafting the specifications there are three different terms used to reference different portions of the specifications, "specification," "section" and "article." Specification refers to the entire group of specifications. See, for example, the use of the word in Section 01 00 02, Articles 1.1(A), 1.2(A) and 1.3(A). When referencing a particular portion of the specification related to a particular type of work it is referred to by Section. See, for example, Section 01 00 02, Articles 1.4(B)(2), 1.5(B) and 1.10(C). When limiting the reference to a particular numbered portion of a section it is referred to as an Article. See, for example, the use of the word in Section 01 00 02, Article 1.6(J) and 1.10(C).

*Id.* at 4-5.

In reply, Defendants contend that the Subcontract in fact incorporated A Mountain's Proposal, which in turn incorporated the Project Specifications. Defs.' Obj. Pl.'s Summ. J. Additional Evidence & Reply Pl.'s Resp. Opp'n Mot. Partial Summ. J. ("Reply") at 4, 8-9 (Apr. 12, 2024), ECF No. 48. Defendants further argue that A Mountain, while claiming ambiguity in

the Subcontract, has failed to identify any particular term as ambiguous. *Id.* at 7-8. Defendants dispute A Mountain's reading of the organizational terms in the Project Specifications: "A Mountain claims that 'specification' singular, 'refers to the entire group of specifications,' . . . but A Mountain mistakenly cites to clauses that include the term specification**s**, the plural." *Id.* at 9 (citation omitted). This demonstrates, Defendants argue, that the term "specification" in 2.1(c) "is not a reference to all of the requirements for the Project. It is instead merely limited to the specification in which it is contained." *Id.* at 9-10. Finally, Defendants emphasize that A Mountain does not argue that Section 32 12 16 (1.2)(A), providing that the NMDOT Spec. applies only as specified, is ambiguous. *Id.* at 11.

      2.      Analysis

          i.      <u>Incorporation of the Project Specifications in the Subcontract</u>

The Subcontract incorporates A Mountain's Proposal, which in turn incorporates the Project Specifications. "For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Morris v. Walmart, Inc.*, No. CV 22-16-BLG-SPW, 2024 WL 3784113, at *8 (D. Mont. Aug. 13, 2024) (quoting Francis C. Amendola, et al., C.J.S. Contracts § 419 (2024)) (applying Montana law). "Although there is no 'magic' language necessary to incorporate documents by reference, there must be some language expressing the parties' intent to be bound by the terms of the incorporated document." *Watkins & Shepard Trucking, Inc. v. Jofran Sales, Inc.*, No. CDV-2016-46, 2017 Mont. Dist. LEXIS 20, at *8 (Mont. Dist. Ct. 2017). Relatedly, Mont. Code Ann. § 28-3-203 instructs that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction are to be taken together." The Montana Supreme Court has not been overly restrictive in the phraseology it considers to signify incorporation by reference.

The Supreme Court's decision in *Wurl v. Polson School District No. 23* is instructive. 127 P.3d 436 (Mont. 2006). There, the court addressed whether a speech pathologist's employment contract with a school incorporated by reference the entirety of a collective bargaining agreement, or only a limited portion thereof. *Id.* at 441. The contract stated, in relevant part: "[T]he salary stated above, based on the Negotiated Teacher's Salary Schedule currently adopted by the Board of Trustees, shall be considered as part of this Agreement, and the Teacher signing this Agreement assents to each provision of the said school salary schedule and other provisions as outlined in the [collective bargaining agreement]." *Id.* at 442. The Supreme Court concluded that the language of the contract was clear and unambiguous—the speech pathologist "assented to the provisions of the salary schedule as set forth in the [collective bargaining agreement], as well as all 'other provisions'" of the same. *Id.* The school district defendant argued that because the collective bargaining agreement was mentioned in a salary-related paragraph, its incorporation should be limited to salary. *Id.* The court disagreed, reasoning that "[t]he phrase 'other provisions' is not modified by any language limiting which [collective bargaining agreement] provisions are included." *Id.* The school district's position would have the court "ignore [its] proper role in interpreting contracts and insert language such as 'salary-related' into the clear, unambiguous and inclusive phrase 'other provisions' in the contract." *Id.*

Here, the Subcontract states in the first substantive paragraph that CHP engaged A Mountain "to provide [CHP] with services . . . consisting of: Provide all necessary labor and materials as outlined in the Contract 36C78622C0021, Pave roadways, Fort Bayard National Cemetery, 200 Camino De Paz, Fort Bayard, NM 88036, Statement of Work (SOW), drawings and as provided for in the A Mountain Construction quotation of 14 February 2022." Subcontract at 1, ¶ 1. This provision clearly incorporates by reference the A Mountain Proposal—that

document is dated February 14, 2022, and it provides A Mountain's price quotation. No Party suggests that the phrase "the A Mountain Construction quotation of 14 February 2022" could refer to any other document. Although the Subcontract does not use the magic words "incorporated by reference," the only reasonable reading of paragraph 1 is that the work contracted for in the Subcontract is specified and described by the referenced documents. Indeed, were it not so, the Subcontract would be essentially useless. It is a relatively short document that nowhere else discusses what exactly the services are that are the subject of the contract. If paragraph 1 does not incorporate by reference the documents it cites, then the Subcontract does not describe at all, let alone with the requisite particularity, what it is even for. Moreover, as Defendants point out, Reply at 4, A Mountain in fact included the Proposal in the midst of the copy of the Subcontract that it attached to the Complaint. *See* Subcontract at 3. By A Mountain's own account, therefore, the Proposal is properly considered part of the Subcontract. *See Idaho Asphalt Supply v. State*, 991 P.2d 434, 435 (Mont. 1999) (recognizing incorporation by reference in contract of specifications that were attached thereto).

For similar reasons, the Proposal is properly read as incorporating by reference the Project Specifications. The Proposal states: "All material is guaranteed to be as specified in the specifications. The work is to be performed in applicable accordance with the drawings and specifications as well as any subsequent Addenda () submitted and shall meet all governing standards." Subcontract at 3. No Party suggests that the term "specifications" as used in the Proposal refers to anything other than the Project Specifications. By that language, therefore, the Proposal plainly incorporates the Project Specifications as the plans for the project. Again, if the Proposal was not read to incorporate the Project Specifications, it would fail to describe the proposed work at all and defeat its own purpose.

A Mountain's conclusory assertion that "[t]he [S]ubcontract between the [P]arties contains no incorporation by reference of the Specifications, the A Mountain [P]roposal or the prime contract," Pl.'s Br. at 3, fails to refute the plain language of the Subcontract and of the Proposal that clearly references those documents. Indeed, A Mountain's briefing repeatedly evinces its own understanding that its work was governed by the Project Specifications. *See, e.g.*, Pl.'s Br. at 1-2 ("A Mountain admits that its proposal was to perform work in accordance with the drawings, specifications and any subsequent addenda."). The language referencing the Proposal in the Subcontract, and the language referencing the Project Specifications in the Proposal, makes it "clear that the parties intended" those documents "to be read together . . . as the basis of the contractual relationship" between CHP and A Mountain. *DeNiro v. Gasvoda*, 982 P.2d 1002, 1005 (Mont. 1999).

ii.      The Project Specifications Do Not Incorporate the Entirety of the NMDOT Spec.

The Court now turns to the question at the heart of this dispute: whether the Project Specifications are ambiguous as to the degree to which they incorporate the NMDOT Spec. Under Montana law, a contract's ambiguity is a question of law for the court. *King Res., Inc. v. Oliver*, 59 P.3d 1172, 1177 (Mont. 2002). Where a contract has been reduced to writing, "it is to be considered as containing all those terms," Mont. Code Ann. § 28-2-905, and "the intention of the parties is to be ascertained, if possible, from the writing alone[,]" *Wurl*, 127 P.3d at 441. "Thus, where a contract's terms are clear and unambiguous, a court must apply the language as written." *Id.*; *see also Mary J. Baker Revocable Tr. v. Cenex Harvest States, Coops., Inc.*, 164 P.3d 857, 864 (Mont. 2007) ("[A]s a general rule, evidence of the circumstances under which an instrument was made may not be considered when the language of the instrument is clear and certain in its terms."). A court may, however, consider outside circumstances "for the purposes of determining, as a

preliminary matter, whether the instrument contains an ambiguity." *Mary J. Baker Revocable Tr.*, 164 P.3d at 864. Only if the court finds a contract to be ambiguous as a matter of law does the interpretation of the ambiguous term become a question of fact for the factfinder. *Wurl*, 127 P.3d at 441-42.

Although A Mountain is not entirely clear as to which term(s) of the Subcontract it asserts is/are ambiguous, it appears that the asserted ambiguity turns on the meaning of the term "specification" (in the singular) as used in the Project Specifications. Upon a close reading, the Court concludes that Defendants have the correct interpretation: "specification" unambiguously refers only to a specific provision, and therefore Section 32 12 16 (2.1(C)(2)) does not modify the entirety of the Project Specifications. The plain language of Section 32 12 16 (1.2(A)) limiting the applicability of the NMDOT Spec. "to the extent specified" controls.

Reprinted below is a sample from the beginning of Defendants' Exhibit 3 (attached to their opening brief, ECF No. 37-3) to demonstrate the formatting used in the Project Specifications:

```
Bid Documents                           Project No. 885CM3011
Fort Bayard National Cemetery                      8 July 2021
Pave Roads, Repair Storm Drains & Water Utilities

                        SECTION 32 12 16
                        ASPHALT PAVING

PART 1 - GENERAL

1.1   SUMMARY

   A. Section Includes:

        1. Composition, mixing, and construction on prepared subgrade,
              aggregate base, and protection of hot asphalt concrete pavement.
```

The Project Specifications use several terms to describe various subdivisions. "Section" is the largest category and refers to the entire set of rules contained therein. The two parts of the Project Specifications before the Court are, as mentioned above, "Section 01 00 02" and "Section 32 12 16." Both documents print those respective titles at the top, in bold, all-caps, center-aligned text.

Case 2:23-cv-00106-MIS-GBW    Document 71    Filed 06/10/25    Page 33 of 39

*See* ECF No. 37-3 at 1; ECF No. 48-3 at 1; *see also* ECF No. 48-3 at 4, 8 (referring to other sections with the same numbering format). Proceeding in descending order, "Part" is the next largest subdivision. Where applicable, it appears (for Part 1) below the section title, and before the numbered components contained therein. *See* ECF No. 37-3 at 1, 4, 5. Section 32 12 16, for example, begins with "PART 1 – GENERAL," under which are numbered items all formatted as 1.# (i.e. 1.1, 1.2, etc.), then continues with "PART 2 – PRODUCTS," under which are numbered items all formatted as 2.#. *See id.* at 1, 4. "Article" refers to each numbered item. This is made clear in several instances of "Article" within Section 01 00 02. At page 8, for example, the document states: "Refer to Article, 1.11 'Restoration', and Article 1.6 'Operations and Storage Areas' . . . ." The numbers and titles indeed correspond to numbered items within the section. ECF No. 48-3.

Within each article there are items lettered, slightly indented from the left; following some letters there are numbered items, slightly indented further still. *See* example above. Conventional rules of formatting as well as context make clear that the lettered items are components within the article, and the numbered items, indented underneath lettered items, are sub-components of that lettered item. Take, for example, Section 01 00 02, Article 1.9 DISPOSITION AND RETENTION:

```
1.9 DISPOSAL AND RETENTION
    A. Materials and equipment accruing from work removed and from demolition
       of buildings or structures, or parts thereof, shall be disposed of as
       follows:
       1. Reserved items: There are no reserved items for the government.
       2. Items not reserved shall become property of the Contractor and be
          removed by Contractor from the Cemetery.
```

Clearly, items 1 and 2 are sub-points of A.

33

This leaves to be determined the meaning of "specification." The only instance of "specification" in the singular in the two sections of the Project Specifications currently before the Court is in Section 32 12 16, Part 2, Article 2.1 (titled "ASPHALT PAVING AGGREGATES"):

PART 2 - PRODUCTS

2.1   ASPHALT PAVING AGGREGATES

   A.  Aggregates: Crushed stone, gravel, sand, or other sound, durable mineral materials processed and blended, and naturally combined.

   B.  Base Aggregate Maximum Size:

      1. Base course over 152 mm (6 inches) thick: 38 mm (1-1/2 inches).

      2. Other base courses: 19 mm (3/4 inch).

   C.  Asphaltic Base Course:

      1. Maximum Particle Size: 25 mm (1 inch).

      2. In conflicts between this specification and requirements in New Mexico Department of Transportation Standard Specifications for Highway and Bridge Construction (Latest Edition), the New Mexico Department of Transportation Standard Specifications for Highway and Bridge Construction takes precedence.

A Mountain argues that "specification" singular "refers to the entire group of specifications." Pl.'s Br. at 4-5. In their reading, that is, "specification" is larger than "section," and "specification" is synonymous with "Project Specifications" as the Court has been using the latter phrase throughout this Order. Such a reading lacks a textual and logical basis. As Defendants point out, every example that A Mountain cites as support for their proffered meaning of "specification" is actually an instance of "specifications" *plural*. The uses throughout the Project Specifications of the word "specifications" demonstrate it is in fact that plural term that refers to the entirety of the specifications. *See, e.g.*, ECF No. 48-3 at 1 ("Contractor shall completely prepare site for building operations, including demolition and removal of existing structures, and furnish labor, materials, equipment and services and perform and complete all work for FT. Bayard National Cemetery: Paved Roads, Repair Storm Drains & Water Utilities as required by drawings and *specifications*." (emphasis added)). "[T]his specification," then, clearly does not refer to the entirety of the Project

34

Specifications. One need only reflect for a moment to realize that it would be grammatically illogical if it did: "specification," lower case, denotes a non-proper noun, referring to a single item. *Cf. Winter v. State Farm Mut. Auto. Ins. Co.*, 328 P.3d 665, 669 (Mont. 2013) (noting that the terms and words of a contract "are to be given their usual meaning and construed using common sense" (citation omitted)).

"This specification" as used in Article 2.1(C)(2) thus unambiguously refers to the specific provision in the immediately preceding sentence specifying "Maximum Particle Size." *Cf. Kalispell Aircraft Co., LLC v. Patterson*, 443 P.3d 1100, 1106 (Mont. 2019) (noting that use of the term "discrepancies" did not make the contract ambiguous because "[t]he sentence in which 'discrepancies' is used immediately follows the sentence about conducting an inspection of the aircraft[,]" and so "[r]eading the contract as a whole, the only thing to which 'discrepancies' could refer is the inspection of the aircraft.").

Moreover, to read the phrase "this specification" in the manner A Mountain urges would render a nullity another piece of the Project Specifications. Per Mont. Code Ann. § 28-3-202, "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 32 12 16, Part 1, Article 1.2 (titled "Applicable Publications"), A. states: "Comply with references to extent specified in this section." ECF No. 37-3 at 1. Based on the above analysis of terms, "section" refers to the entirety of the packet of rules titled "Section 32 12 16 ASPHALT PAVING." Article 1.2 goes on to list, in B. through F., publications related to asphalt paving. F. is the NMDOT Spec. *Id.* at 1-2. Article 1.2, therefore, clearly instructs that throughout Section 32 12 16 the NMDOT Spec. should be complied with where referenced and "to the extent specified." This provision is unambiguous, and cannot be reconciled with the reading of "this specification" that A Mountain suggests.

A Mountain argues that "[t]he ambiguity of the contract and the Specifications is relatively clear as evidenced by the interpretations assigned to it by the parties during the course of the project." Pl.'s Br. at 4. Because the Court concludes that the language of the contract is clear and unambiguous, the Court will not consider extrinsic evidence. *See Kalispell Aircraft Co.*, 443 P.3d at 1105 ("A court may only turn to extrinsic evidence when an ambiguity exists.").[18] Which Party drafted the contract is similarly irrelevant, because the principle that a contract should be construed against the drafter applies only where the contract is ambiguous. *Mary J. Baker Revocable Tr.*, 164 P.3d at 860.

To summarize, the Project Specifications (as incorporated in the Proposal, in turn incorporated in the Subcontract) are unambiguous as to the degree to which the NMDOT Spec. governs. Section 32 12 16, Part 1, Article 1.2 clearly states that references to the NMDOT Spec. are to be complied with "to the extent specified in this section." This language is capable of only one interpretation, which is not called into question or made ambiguous by the language of Article 2.1(C)(2). *Cf. Krajacich v. Great Falls Clinic, LLP*, 276 P.3d 922, 926 (Mont. 2012) (in interpreting a contract, "[m]ere isolated tracts, clauses and words will not be allowed to prevail over the general language utilized in the instrument" (citation omitted)).

D.      *Termination of the Subcontract*

1.      Parties' Arguments

Defendants additionally move for summary judgment on A Mountain's claim that CHP wrongfully terminated the Subcontract. Defs.' Br. at 1, 7-8. Defendants highlight the "unique" term in the Subcontract stating that "[t]he term of this Agreement . . . will remain in full force and

---

[18] A Mountain's proffered evidence is not "[e]vidence of the circumstances under which a contract was made[.]" *Corp. Air v. Edwards Jet Ctr. Mont. Inc.*, 190 P.3d 1111, 1120 (Mont. 2008).

effect until October 31, 2022, subject to the earlier termination as provided in this Agreement. The Term of this Agreement may be extended by mutual written agreement of the Parties." Subcontract at 1-2. According to Defendants, there was no mutual agreement to extend the contract and CHP notified A Mountain that it would not be extending. Defs.' Br. at 7. The Subcontract therefore expired by its own terms—"[t]here was no termination[.]" *Id.* A Mountain responds that the project schedule was "extended as a result of delays and changes in the work," Pl.'s Br. at 5, and that contemporaneous correspondence demonstrates that CHP clearly expected work to continue "notwithstanding the end of the contract term," *id.* at 5-6. A Mountain argues that its work was delayed for reasons entitling it to additional time, and so termination for failure to complete within a specified time constitutes a basis for a claim of wrongful termination. *Id.* at 6. "CHP Solutions seeks merely to make use of the rather unusual subcontract language to avoid the obvious implication that it terminated the contract for default." *Id.* In reply, Defendants emphasize that the Subcontract merely expired and was not extended. Reply at 11-12.

      2.      Analysis

The Subcontract is unambiguous: it expired by its own terms on October 31, 2022. Accordingly, CHP did not "terminate" the contract, wrongfully or otherwise, and Defendants are owed summary judgment on this issue. As discussed above, "where a contract's terms are clear and unambiguous, a court must apply the language as written." *Wurl*, 127 P.3d at 441. The Subcontract states in no uncertain terms that it "remain[ed] in full force and effect until October 31, 2022," unless extended "by mutual written agreement of the Parties." Thus, by pure operation of the Subcontract, and without any action from any Party, the Subcontract expired on that date. *Cf. Collings Game of Mont. v. Daniels*, No. DV-03-365, 2004 Mont. Dist. LEXIS 2458, at *2-4 (Mont. Dist. Ct. 2004) (enforcing provisions stating that contracts "shall terminate and expire with

Case 2:23-cv-00106-MIS-GBW    Document 71    Filed 06/10/25    Page 38 of 39

entirety" on particular dates); *Monte Vista Co. v. Anaconda Co.*, 755 P.2d 1358, 1363-64 (Mont. 1988).

A Mountain's argument that the Parties agreed to continue work beyond the October 31 expiration date is inapposite. It is undisputed that there was no written agreement between the Parties to extend the Subcontract. Defs.' Br. at 3, Spedalieri Aff. ¶ 13, ECF No. 43-1. This alone ends the inquiry: the Subcontract is utterly clear that it could be extended only in that manner. *See Collings Game of Mont.*, 2004 Mont. Dist. LEXIS 2458, at *2-4 (declining to find contract continued in force where it expressly required "mutual *written* agreement of the parties" to extend, which there was none). The Court cannot consider extrinsic evidence to vary the terms of an unambiguous contract. *Kalispell Aircraft Co.*, 443 P.3d at 1105. Any evidence from A Mountain that purports to demonstrate some tacit understanding between the Parties as to the continuation of work is improper extrinsic evidence.

Because the Subcontract expired by its own terms, not by termination by CHP or any other Party, A Mountain's claim that "CHP's termination . . . was a wrongful breach of contract" necessarily fails.[19] Defendants' motion for summary judgment is therefore GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment Concerning the NMDOT Specification Not Being Wholly Incorporated and that There Was No Wrongful Termination of the Subcontract, ECF No. 36, is **GRANTED**.

The Parties shall have **FOURTEEN DAYS** from the date of this Order to schedule a settlement conference with United States Magistrate Judge Gregory B. Wormuth. The Parties are

---

[19] The Court notes that, to the extent A Mountain in fact completed work after October 31, 2022, it could conceivably have a claim for payment under a theory of unjust enrichment or equitable estoppel. *See, e.g.*, *Missoula County v. State*, 547 P.3d 1268, 1275-76 (Mont. 2024); *Smith v. Gunniss*, 144 P.2d 186 (Mont. 1943). But A Mountain neither pleaded nor briefed such a claim. *See generally* Compl.; Pl.'s Br.

reminded that should the case fail to settle, pursuant to the undersigned's Standing Order

Regarding Civil Trials they must file a joint motion requesting a trial setting.


**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE